United States v. Chen. Case number 23-6199. Thank you. Counsel. Good morning, Your Honours. May it please the Court. I represent Chao-Long Chen on appeal from his conviction. The Postal Inspector's opinion that all the keys seized in this case were counterfeit arrow keys was an expert opinion admitted in violation of Rules 701 and 702. His testimony was that he had seen many counterfeit keys in his investigations and that he could tell by looking at these keys that they were all counterfeit arrow keys. Counsel, can I just, I mean, it seems to me that there's no real dispute that this was an inauthentic key, right? The defense was never that he had an authentic key. That would be a different violation of the law. The defense was that these are not keys at all because they don't open boxes and that your client didn't possess the ones that were found under the car, right? The defense, yes, was that he didn't possess the ones that were found under the car and that the unusual looking long key with two ends was not a counterfeit postal key because it did not open any postal box. Right. So, I mean, so even if what the agent said was improper, I mean, there's, you weren't arguing that it was an authentic key. You were, nobody was disputing that it was that these hunks of metal were not authorized authentic keys, right? Well, it did not have to be an authentic key. It had to be a key, a counterfeit postal key. It doesn't matter if it's some other kind of key that doesn't open a postal box. It could be any kind of key, authentic or inauthentic, but if it's not a key that is suited to a postal box, it doesn't violate this section. Right. So what does the, what does it matter whether the office, the postal inspector said that it's a counterfeit key? How did that affect the jury's deliberation? Because he said that it was a counterfeit postal arrow key, which is exactly the question that the jury had to answer, and that was the only evidence that the government had that this particular key, which was the only one found on Mr. Chen, was a counterfeit arrow key because it didn't open any box and it didn't look like the others, which two of them did open a box. It didn't look like them and the others weren't found on him. So I get all that, but the instruction to the jury was they had, the government had to prove two things beyond a reasonable doubt. First, that the defendant knowingly and willfully possessed a key that was suited to any lock adopted by the postal post office department. And so whether, that's the question, right? Exactly. And so the only evidence that that key, the long key, not the others found nearby, but the key found in Mr. Chen, was a lock suited to a post box. Was the postal inspector's testimony that, yes, this was, like all the others, a counterfeit arrow key. That was really the only evidence they had. So your argument is that the jury could have felt on the key other, because the inspector gave opinion that that was a counterfeit postal key. However, it didn't hold the postal lock. So it had not been adequately proved that the key in the pocket was a counterfeit postal key, even if it is correct that there was sufficient evidence for the jury to find guilt based on the keys that were found on him. However, the judge's instructions and the testimony allowed them to find guilt on the basis of the key in the pocket, which was not demonstrated to be a counterfeit postal key. Is that correct? Exactly. That's exactly correct, Your Honor. That the only piece of evidence that proved that it was a counterfeit arrow key was the inspector's testimony. His expert testimony, which was unlawfully admitted as lay opinion testimony. But I have another another problem. Judge Gislevall, speak into the, if you would speak a little into the microphone, that'd be better. I have another thing. The defense did not request a continuance, I mean a problem of to give help, a problem of comply with Rule 72. Not necessarily a late case, because the defendant can ask for and receive a continuance and require the government to now give the disclosures that were required prior to trial, but can give them now. And the judge could give a continuance so the defendant could prepare to defend. So that's one problem as to why the defendant asked for a continuance, if the defendant was arguing that failure to comply with the requirements of expert testimony. But then on the other hand, the government hasn't argued your failure to ask for that continuance. So we've got arguments on both sides here of forfeitures of what might have been good and sufficient strategies. Your Honor, there was no forfeiture of this issue because this this particular objection, specific objection, based on the admission of expert testimony, was summarily denied by the court. There was no basis to ask for a continuance because the court did not give any, did not accept that in any way and said that this was proper lay opinion. So there was no there was no basis for a continuance. I mean if the court had said, well it might be expert testimony but we're in the middle of trial now, then it would have been appropriate for the defense counsel to ask for a continuance. But asking for a continuance would just be repeating the same objection. The defense counsel could say, Judge, I think this is a proper step out of the lay testimony, not requiring prior notice. But the appeal may disagree with you on that. And if they do, you will be, if they do, this is a problem and you can cure that problem by granting us a continuance so that so that we can prepare for this testimony and call contrary expert testimony. Well, your honor, the rule for preservation of an error is that it be objected to on the proper grounds and that was done in this case. In fact, there was a long argument on the record about this and the court simply denied it. So there was there was for the defense counsel to then ask for a continuance would just be repeating the same objection that had just been denied. Your honor, let me let me let me ask you about the testimony of Mr. Dalton. Let's just say that there was an error and now I'm trying to explore why that error might not have been harmless. And I think it's to pick up a little bit on what Sullivan said or asked. Why isn't Mr. Dalton's testimony, together with the unobjected to testimony from the inspector, the post inspector, enough? Understanding that it's not, we're not looking at sufficiency of the evidence, but we're looking at whether or not the is significantly in favor of the government and against your client. Well, nothing that Mr. Dalton said addressed the question of whether this long key, the only one that was found on Mr. Chen, was a counterfeit postal key. He just described the way legitimate keys were made and went through all of that, but he didn't address this particular key that was the counterfeit key, or was he shown the version? No, I don't believe he was shown the keys. I don't believe he was shown the keys, but I'm not sure. The person who was shown the keys and said straight out, these are all counterfeit keys, was the postal inspector. Right, and if I could just turn to... He said he was not shown the keys at appendix page 276 side to side. No, I don't believe he was shown the keys. He just testified as to how important the arrow keys were and how they were made and all of that. Well, let me ask you this, would it have been objectionable for him to be shown the two keys side by side and to testify that the key on the left is legitimate, this is the 276 again, and that he doesn't recognize the other way? Yes, that would have been legitimate, but that still wouldn't have made the case as the inspector's second testimony did, that the long key was a counterfeit key. Can I just ask, and it seems to me you're using counterfeit to suggest that the inspector was saying that this key opens other boxes, but there was testimony about whether the key found in his It seems to me the more plausible explanation as to what the inspector meant when he said these are counterfeit keys is that these are not authentic keys. These are not keys issued by the postal service, and that wasn't in dispute, was it? Your defense was not, this is an authentic key that was issued by the postal service. No, that was not our defense, and that was not what he said. He said specifically, and this is at A121 to 122, what are these? These are counterfeit keys, counterfeit postal arrow keys, not just counterfeit or inauthentic keys, counterfeit postal arrow keys, keys suited to a postal lock, in other words. How do you know that? I know that because I've seen these keys before. There was an objection, and then the court asked, have you seen keys before that look like these keys? Is that what you said? Yes. The court said, I will let that stand, and if I could just turn to how important this was, how the government used this. I'm sorry to interrupt, I'll let you, I think we'll let you get to that point, it's up to him really, but you're saying that that implies that this hunk of metal that was identified as a counterfeit key opened boxes. Or is a counterfeit key? What, the jury was only instructed that they had to find that this was a key suited to any postal box. The defense argued that this wasn't such a key, the long key, because it didn't open any box, and the government said in its summation, postal inspector Segnan told you that he had seen other counterfeit keys that looked just like these keys, including the long one. In its rebuttal, responding to the defense argument that this was not suited to a postal box because it could not open one, the government's response was only, you heard the defense say that this did not open a postal box. That is true, but that doesn't mean the long key is not an arrow key. Postal inspector Segnan told you that he has seen counterfeit arrow keys that look like all of these before. So that was, that basis of the government's argument. First of all, in order to satisfy the government's obligation, the government needed to prove, first of all, that it was not an authentic postal key, counterfeit. Second, to be a counterfeit key, it had to be capable of opening boxes, right? Yes, it had to be suited to a postal lock, and that was not explained to the jury what that meant. That was left for the jury to determine. So the government argued that it didn't have to open the box. I don't think the key can be suited to a particular lock if it doesn't open it, right? Well, yes, that's what the defense argued, but the jury wasn't told that it had to find that. So all it had to find was whether this was basically a counterfeit key, whether it was and the government argued that it was sufficient. I'm sorry, go ahead. I'm sorry. The law does require, does it not, that the key be capable of opening the locks. It has to both not be authentic, but at the same time, it must be capable of opening the locks. The fact that it looks like a key that can open the locks doesn't make it a key that's suitable to that lock. That's correct. That's correct, Your Honor. That's what the defense believed and that's what we believe. So with respect to the key, there was no evidence whatsoever that it would open a postal lock. There was none. But you're not challenging the sufficiency of the evidence. No, we're not. We're not challenging the sufficiency of the evidence only for the I thought you just said there was no evidence that it opened the lock. There was no evidence other than Segment's testimony that this was a counterfeit postal key. No, no, he didn't say it opened the lock. He didn't. In fact, he conceded it didn't. So what I'm saying is if it was only the long key at issue in the case, we would have argued insufficiency, but we didn't argue insufficiency only because with respect to the ring of keys that was found nearby, the evidence was sufficient, although not strong, that that key you know that that that that that that ring contained it contained two keys that opened the box and that it could have been thrown there by by Mr. Chan, that it could have been. So it seems to be your best argument with respect to this. There's no question that there was sufficient evidence for the jury to find that two of the keys that were in the key ring under the because they were not genuine and they were demonstrating open postal keys. But as to the key in his pocket, on which the case is possession of a strong print, there was no evidence that it could open a postal key. That's correct. The jury, by the instructions, find guilt on the base of his pocket, although there was no evidence that the key in the pocket fitted the bill because there was no evidence capable of opening a postal key. That's correct, your honor, and the only the only the only thing there was was what the government argued twice in summation on the long key, which was it doesn't matter if it if it turned the key. They argued that just fitting into a lock, just being able to go into a lock, was enough and that you heard inspector Segnan say that this key, including the long key, all the keys including the long key, was a counterfeit postal key. And so that was all the jury needed to convict him on the long key. Okay, well you've you've reserved some time for rebuttal. We'll therefore hear from the government and then we'll get back to you. Thank you. Thank you. Good morning, your honors. May it please the court. My name is Lorena Michelin and I represent the trial counsel below. The district court's judgment should be affirmed in all respects. The inspector's testimony was permissible lay witness testimony and fell comfortably within the permissible bounds of the rules of evidence. Appellant's counsel is arguing. How is it permissible lay testimony? You're saying it doesn't require an expert to be able to, doesn't require specialized knowledge, able to look at a key and say that key was especially when tested and they failed to confirm that. I mean it seems to me that any line between what is allowed under 701 and what requires going through the requirement system is very, very difficult. But I don't see, I don't see an expert testimony to be able to simply look at a key, not even compare it, not even hold it side by side, compare the ridges, but just to look at the key and say that key is a key that will open a postcard. Why is that not an expert testimony? Your honor, explain why that's not based on specialized knowledge. Your honor, the notion that the inspector's statement was based only on his prior experience with arrow keys and his observation of arrow is belied by the record that was in front of the jury and that's in front of this court. Appellant's counsel is arguing as if the inspector had not tested the arrow keys, a fact that is impossible to separate from his testimony and his statement that the keys at issue were counterfeit. Appellant also just said that the only evidence that the agent had was order to back up this statement was that the one key turned the lock, the key in his pocket, but that that's not the case. I mean the inspector went. Are you explaining to how justifies the conclusion that testimony that this, the basis of looking at it, is a key capable of opening a postcard? It depends on how it appears to be under 702. Now, I ask you, how his testimony, based on looking at a key, that that key will open a postcard. Why is that not based on specialized knowledge? Can you look at that? Can you look at the key and tell by looking at it whether it can open a postcard? I can't. Right, your honor. If that was what had happened during the inspector's testimony, that would have been, that would have fallen under rule 702, but that's not what the record shows. The inspector. That is what happened. It's not the only thing that happened. He also said, he also said that two of the keys on the ring under the car had been demonstrated to open postcards, so that was not expert testimony. That was something you or I could do. We could just put the key in the postcard and if it opens it, it opens it, so that was expert testimony. But he, in addition, testified on the basis of looking at all fixed keys, that they're all counterfeit postcard keys, which means that they're all capable of opening postcards. Right? Right, your honor, and it was a little bit hard to understand you at the end, but I believe I understood your honor's question. And just the government's, in the government's view, the inspector's testimony wasn't rooted exclusively in his expertise. Well, if he had only made that statement, the challenge statement, based on his prior experience working on other counterfeit arrow key cases, then yes, that would have fallen under Rule 702. But in this case, from approximately 28 pages of his testimony transcript, approximately seven of those pages was him describing in detail the test that he did. And the challenge statement, when he says, I've seen these keys before, he literally had seen those keys before and he tested them in postal locks, in two different locks. He recorded himself testing some of those keys. That video was produced to the defense and the jury saw that video as well. As to the key in his pocket, his testimony permitted the jury to find that that key in his pocket, which is the one he surely has possession of, that key in his pocket was a counterfeit postal key, i.e. one that could open a postal. There was no other evidence that that key could open a postal. So the jury could, as I see it, the jury could convict only on the basis of two keys on the ring under the collar, and could not properly convict on the basis of the key in his pocket unless his expertise in being able to just look at the key and say that key, although not a genuine key, will open a postal. No, your honor, that's not the case because the elements of the crime did not require that the key actually open a lock. What it just stated is that the key is suited to any postal lock and at no point the jury... How is the key suited to a lock if it can't open? Well, for example, your honor, it could have been designed in a way that matches the specific protrusions of an arrow key, the shapes of what the witness, Robert Dalton, described as fittings, which is the part of the key that actually, whether the lock opens or not depends on that key. So the key, first of all, did not need to open the lock in order for the defendant to have violated the law, and at no point was the jury instructed that opening a lock was... You're saying that a key that can't open a lock is suited to that lock? Yes, your honor, and at no point the defense requested an instruction or anything along those lines to state that the element or the government had the burden to show that the statute required the key to have opened a lock, as long as it's suited to a postal lock, and that word was not defined in the jury's instructions. At no point did the defendant request an instruction defining suited... Okay, but what's your basis for saying that adopted by the... suited to any lock adopted by the post office would include something that doesn't turn a key, turn a lock? Well, based on Robert Dalton's testimony, where he explains every part of an arrow key, specifically the bittings, which is what he says is the most important part of the key in order to determine if it would even fit in a postal lock, then... This strikes me as a legal question. What does it mean to be suited to any lock adopted by the postal... by the post office department? And so, do you have any legal authority for the proposition that it doesn't have to be able to turn the lock? No, your honor, but this was not an issue that... and part of the reason I don't at this moment is because this is not an issue that even came up during trial. Is this an issue on appeal? In other words, is this part of the earlier this morning that... or implied that the government... part of the government's burden was to prove that the counterfeit keys or the keys that issue actually opened the lock, whereas that was not what the jury was instructed. I don't agree with you. I'd like to know why if you were going to ask him... If you were going to ask him, can you tell by looking at the keys whether it can open a postal lock? And he was going to answer yes. Why didn't you give expert notice required for 702 testimony? Why didn't you sandbag? I mean, why did you blindside the defense by not giving that prior notice and have him explain? He purports to be able to tell by looking at the key. He's got to explain with care what it is about. He's just saying the bidding. I looked at the bidding. Is that how I tell? That doesn't tell you how to distinguish between a key that will and a key that won't open the postal. So I don't understand why you didn't give the notice. If you had, all this would disappear. Your Honor, the defense was not blindsided because this was absolutely fact, lay witness testimony. In fact, the government's position is that, and the record, you know, it's clear when you see the full statement that the inspector made, that his statement, the challenge statement is based on the test that he conducted. And defense counsel had that test. They had a video of the test in advance. But that was only about two keys. He testified all six keys, and there's a big difference between the keys, one key, which he undisputedly had possessed, and five keys that if all of them had been in his pocket, then there'd be a very strong argument that his testimony that two of the keys, in fact, were observed to open the postal lock concluded the issue conclusively so that there'd be no point arguing about the others. But there was a significant difference between the one in his pocket and the ones that were not. And there was no evidence that the key in his pocket could open the postal lock other than his saying, I could tell by looking at it that it's suited to a postal lock, which doesn't mean anything if it doesn't open. Right, Your Honor. But that's assuming that the key in the defendant's pocket hadn't had fit and twisted the lock. And the inspector explained as well how he didn't apply a normal amount of force. And then if you compound that with Robert Dalton's testimony, who explains in detail the difference between regular keys and arrow keys, then it's clear that a regular key couldn't have fit inside of a postal lock and even twisted it. May I just follow up on this? Because I think that now we're confusing sufficiency as a standalone challenge, I think, from the question of whether if there was error, in other words, if there was a 702, 701 error, the remaining untainted evidence was sufficiently strong to render that error harmless, right? On Mr. Dalton, you heard my series of questions with your friend on the other side. He was actually not shown the keys. Is that correct? Yes, Your Honor. Okay. So he just talked about or testified about in a more general way, these are the keys that we manufactured. These are what they look like. But it's not shown by a comparison in a way that might have been helpful to the jury. This is our key. So the key on the left at page 276 of the appendix and the key on the right, I don't recognize. Is that also correct? That's correct. That did not, he was not shown. So let's assume, and of course, there's some other, as I think Judge LaValle and Judge Sullivan have both mentioned in their questions, there's unchallenged portions of the postal inspector's testimony. If we set aside the, I think, more or less challenged portion of the testimony that's in the appendix from 120 or so to 122, maybe 117 to 122, what else is there? Because there's also a difference between, as Judge LaValle has pointed out, what was found in his pocket and the keys that were not found in his pocket. Is that part of the analysis that we should undertake in determining harmless error? Yes, Your Honor. Absolutely. And if the challenge statement were to be removed and taken away from what occurred at trial, it wouldn't have made a difference otherwise. The inspector goes on to explain the test and both the inspector's testimony along with Robert Dalton's testimony are evidence of how unique these keys were, how any civilian would not have access to them. So what an unfortunate coincidence of the defendant. How do we know, how do we know, apart from the tainted testimony, I'll just call that as a shorthand, the challenge testimony, how do we know that the keys are, that any of the keys are counterfeit? We know clearly because the keys do not have a marking and both Inspector Segnin and Robert Dalton explained that officially. But doesn't that come, how do you disaggregate that from the tainted testimony? Because part of the challenge testimony is this is how I figure out that these are counterfeit keys, they have a marking. So if you just segregate that, put that to the side, what else in this record? Even without any of Inspector Segnin's testimony, Robert Dalton explains he's shown an official arrow key, he recognizes it, he describes that he knows it's an arrow key because of the marking that it has. And so as Your Honor. The arrow key does not have a marking. The counterfeit keys at issue that the defendant was convicted of being in possession of did not have any markings. And as Your Honors can probably see in the exhibit pictures, it is very, those keys were made of very thin bent metal. It was not a difficult assumption to say that these were official arrow keys. There were clearly not, it's evident in the pictures, there were. Well there's no, nobody ever argued that they were authentic keys, right? That's correct, Your Honor. Ms. Cassidy said that. That's correct. But, but in your view, if the only key involved had been the one in his pocket, the one in his possession, and there's no evidence that it actually turns a key, in other words it's a That would not matter. That would still, this person could still be convicted of forging or counterfeiting a key that is suited to a lock adopted by the post office. Yes, Your Honor. So why? What makes it suited? Just because it looks like a key? I would point Your Honor to exhibit 4L. In that exhibit, Your Honors, 4L that's page 273 of the left side, what's the key that's marked as 8A, that's the official USPS arrow key that Robert Dalton explained. If Your Honor see under the sticker, the middle part of the key under the stickers, those, that's what Robert Dalton described as the bittings. It's a specific pattern that makes it fit into a postal arrow lock. And as Your Honors can see, that does not look like a regular key. It needs to have that specific pattern that Robert Dalton explained as key number 20. It says it on the key, it was marked as USPS key 20. And then it matches, well that's actually the official one, so that's the bidding pattern for postal lock 20. And then if Your Honors see the three keys next to it, those were the three counterfeit keys that the inspector tested. The long one is the one that the defendant had in his pocket. And the other two were two of the five keys that were found next to him. And an important point is that Robert Dalton testified that the top part, what he called the head of the key, is irrelevant in determining whether it opens or even... I get all that, but your view is that as long as they sort of roughly look like this, that's enough to violate the statute. They don't have to actually fit into the key, into the keyhole and turn a lock, right? Right. That seems to me your theory. You agree? Yes, Your Honor. And in this case, it went beyond that because the three keys that Your Honors can see in that picture, 4B, 4C, 4D, all of them were able to be inserted into this particular postal lock. All of them twisted the lock and two of them opened the lock. So suited as a verb really just means made or designed to open, but not necessarily open. Yes, Your Honor. And there's of course the mens rea. Is there a mens rea requirement? There must be. Yes, there was. The second element of the crime requires that the defendant had an intent to and he was caught stealing mail while not using the keys, but that's part of the evidence that elucidated on his intent when he possessed all of these keys. And if Your Honors can... It seems to me there's another possibility that you're avoiding is that, you know, sometimes one puts a key into a lock and it will get, it will go into the lock, but it won't turn. It won't turn. That's not just because it's, that's not just because it's not precisely, it somehow doesn't quite fit this lock. It may be that it's a different altogether and made for a different, for a different lock. Now in this case, you seem to assume that any key that looks a fair amount like the true arrow key is one that was designed to be under fit of the true arrow key, but it wouldn't, that's not necessarily required. It might have been designed for a different lock, a different system of lock, like for example, supposing a company has its own mail delivery system, U.S. postal system, but they make keys that are not different from the U.S. postal keys, and in many ways they look a lot like them, but they won't open any postal lock. They'll open, they'll open other locks and they have biddings that perhaps look a lot like these, like the U.S. different, so they work on that system, but they don't work on this system. I don't know how you can call that a counterfeit postal key, just because it looks a lot in its biddings like a, like a U.S. postal key. How the key can be, unless you demonstrate that it was, that it was, that it was intended to open, the fact that there's a lot of similarity in the shape of the justified conclusion, that's a counterfeit postal key. Right, Your Honor, but in this case, it's not just that the keys looked similar. It's, the pattern was basically identical, and that's corroborated by Robert Dalton's testimony explaining how the biddings went, how the specific pattern for Arrow Key 20. Well, nor was it just the keys. I mean, there was, wasn't there all sorts of other evidence and testimony about how they found Ms. Chen, the circumstances and so on, that tied him or connected him to mailboxes? Right, Your Honor, yes, he was. Can you describe that? Yes, he was caught inside of a small building in Brooklyn attempting to steal mail. He had an open, but he was found with his hands inside of the mailbox. He took out an empty envelope, and then he was confronted by two residents that lived in that building, and they called the police, and that's where they found, he attempted to assault one of the residents with a stun gun, and then when he was arrested, the long Arrow Key Exhibit 4B was found in his pocket, and the other five keys right next to him, I believe Officer Jean Balazs testified approximately two to three feet away from him. That was all shown in body cam footage to the jury where those keys were found, and the officer explained the distance, and then there was 404B evidence that was also introduced at trial. Officer Motola explained how at another time the defendant had been caught stealing mail as well, so this was clearly not the first time, which is relevant to his intent, the second element that the government had to prove. Can I just ask a question intent aside? I mean, it seems to me that the term any key suited to any lock adopted by the post office is in the first section of this statute, which makes it illegal to steal such a that is suited to any lock adopted by the post office department. That's a crime, and then if you forge or counterfeit any such key, that's a crime. It would seem to me that the forging or the counterfeiting has to have the same functionality as the key that is covered in the first section of the statute about stealing, so I don't see why you're suggesting that a key that kind of just looks like the authentic key is enough. Yes, well your honor, as to the first point, that is correct that the first paragraph determines the meaning of the what the such key means, and such key is any key as stated in the first paragraph of the statute, any key suited to any lock adopted by the post office, and here... That's about stealing or embezzling. Those are that's stealing the authentic keys. That's what that one's for, right? And then the second paragraph of the statute says whoever knowingly and unlawfully makes, forges, counterfeits any such key, referencing the first paragraph that describes that type of key, or possesses any such mail lock or key with the intent unlawfully or improperly to use. But it seems the functionality of this key is the same. Whether it's a counterfeit or whether it's a stolen key, it has to be suited to the lock, and since the first section it's clearly going to be suited to the lock because it is an official key, I don't see why the counterfeit would be subject to a lower standard like you're suggesting. Well your honor, in the government's view, the first paragraph does not describe or does not require that the key be official. It just states any key suited to any lock adopted by the post office. So it could be a counterfeit key suited to a postal arrow lock. So it does not need to be an official. And in this case, your honor, there were two keys that actually opened the lock and one that fit and which is not the government's position. Then in this case, that was still met and is backed by the full record and what the jury was presented. Well, thank you. We've kept you well past your time. We'll hear from your friend on the other side. Thank you, your honor. I'll be brief. First, about whether this came up at trial and whether the defense was blindsided, the answer is yes to both. The defense made a rule 29 motion in which it argued that with respect to the long key, the evidence was insufficient because it didn't prove that it was suited to a postal box because it didn't work. And it argued that the evidence was denied. It was denied just summarily with no reasoning. But the government argued that the question of whether it is a counterfeit key is up to the jury. Then the defense argued that in summation that the jury could not find that the long key was suited to the lock because it didn't work. And the government said in its summation, never mind that. Inspector Sagan told you that it's a counterfeit arrow postal key. Second, the defense was blindsided by this because if you look at the record of the objection, the defense counsel said I have no objection to the test. We know about the test. That was in the 3500 material. But this is not that. This goes beyond that. This opinion is inadmissible. What is this when you refer to this? The opinion that based on my looking at these keys that they are all counterfeit keys. The defendant was definitely blindsided by that. And if the jury had had only the tests and only looking at the biddings and the comparison and all of that, there would be no objection. The objection was to the devastating, the most crucial, the most important evidence with respect to the long key, which was the only key found on Mr. Chen, that this was a counterfeit key. I'm an expert basically. I'm a postal inspector. I've seen these keys before. I know a counterfeit arrow key when I see one, and this is one. I don't understand, given the Rule 29 motion you made with respect to the long key, why you're not appealing that here? But you're not. You're only appealing the expert testimony. The reason we didn't appeal that is because the evidence was sufficient with respect to the other two keys. Well, but you asked for a Rule 29 with respect, you mean basically said, you asked that there be a Rule 29 with respect to the long key, right? You asked the court to basically break this down among certain keys, right? No, the Rule 29 motion was two parts. The evidence is insufficient with respect to the long key because it was not suited to the postal box. The evidence was insufficient for the other keys because there was no evidence that Mr. Chen ever had them and that he was under constant observation and nobody saw him throw the key. So it was a Rule 29 motion on the count, on both theories, and the court just denied it and didn't, you know, didn't break down the theories. But with respect to the long key theory, the government argued it's up to the jury to decide whether this is a counterfeit key, and then it argued sort of in bold terms, broad terms, that this was a counterfeit key because whether or not it turned the lock and opened the lock, Inspector Stegman told you that it was a counterfeit key. Choose the law. Well, your second motion, I might quote, boldly, ambitious. The evidence was certainly sufficient. He did have possession of the keys that were within an arm's length of him under the car right next to where he was lying. So if this had been, if your only argument was this is that there's insufficient evidence from which the jury defined guilt, that would just be wrong. But in a way, you're arguing that there was too much evidence because while there was sufficient evidence to find guilt on the basis of those three keys, there was insufficient evidence to find guilt on the basis of the key in his pocket, and the jury is remissed by the situation of expert testimony, and that part of that was the failure to give notice, which blindsided you as to the agent's purported expertise to be able to declare on the basis of looking at them that the keys in the pocket is the key in his pocket. Well, in a postal. That's correct, Your Honor, and that's why we didn't raise insufficiency because we concede that the evidence was sufficient with respect to the shorter keys. However, it was not strong, and without the opinion evidence, because connecting, saying that the long key was also a postal key, because Chen, even though it wasn't found right next to him, it was found under a car, and there's a video which we submitted, and it's exhibit, it's either exhibit five, it's exhibit six. It's on a CD. We submitted it showing when these keys were found. The keys were found, the officer kept saying that we found them on the ground near him, but they were found under a car. He had to reach under the car to find them. It was the fourth officer on the scene who even found them after other things had been searched, and Mr. Chen was not even in the video. There's a lot of space on the sidewalk. You don't even see him, so where he nearby. Also, he said three feet, then he changed it to two feet, so it was somewhere around there was his testimony, but Mr. Chen was under constant observation from the minute he walked out of that building by six people. First, the two brothers, the one brother who stopped him, the other brother who came right down, who were interacting with him the entire time, and this is at appendix 40 to 43 and 48. They were face-to-face interacting with him the whole time. They saw him. He had two packs of cigarettes in both hands. They didn't see any keys. They saw him take out the taser. They saw that. They blocked his way when he tried to run. They were no more than two feet from him the whole time, and then the police arrived, and he was handcuffed immediately, and the police were there watching him the whole time, and nobody saw him throw a set of keys. So yes, it is an it could be just a coincidence, and also the keys where he ultimately was arrested was two blocks from the place. What was the government's, well, maybe I should have asked your colleague, but what was the government's explanation for the lack of eyewitness and videotape? I don't think they had one. They just said it would be, it's too much of a coincidence. Their argument was it was too much of a coincidence, and you heard the officer. He found them very close by, but look at the video and about these keys. Your point, I take it, is that if we are in the harmless era of the territory with respect to these two keys, it may have been sufficient, but it's not sufficiently strong. Exactly. Without the overwhelming and crucial evidence of the opinion testimony, and also all the evidence of his intent to steal mail. Other cases where he was, you know, around suspiciously involved in stealing mail, there was no evidence that any of those involved a postal arrow key, a counterfeit arrow key. He took mail out of unlocked boxes, as far as we know. So can you maybe help me with this question of statutory interpretation involving the term suited in particular? That's what I'm focused on. That was not, that is not challenged, and that was not the subject of any debate at trial, is that correct? It was the subject of debate. The defense argued that suited to a postal lock had to mean it opened the lock, and it made a rule 29 motion on that basis, and it was denied. But as a matter of legal interpretation, statutory interpretation. Yes, yes. But on appeal, have you made that challenge? Have you challenged that? Have you asked us to really think about what it means for a key to be suited to open, to open a lock? No, because we didn't appeal the rule 29 motion because the short keys did open the box. Yes. So that's why we didn't appeal that. No, but it's a legal question. It's a legal question. It's a legal question that you haven't, you're not making, right? I mean, it seems to me that your whole argument about why this is not harmless turns on this matter of statutory interpretation, but you haven't really preserved that. Well, my argument is even if it is not a legal question, because the rule 29 was denied, and the jury instruction was proper, that it was up to the jury to decide what suited to a postal lock meant, that the evidence that was admitted in this case, the opinion evidence telling the jury, don't worry, it doesn't have to turn the lock. The inspector told you it was a counterfeit key, is it as an error at this trial, based on the instruction given, on the jury instructions given, that the jury had to find that this was, that he possessed a key suited to a postal lock. Judge LaValle, did you have a question? No, go ahead. Oh, oh, you're back. Go ahead. The confusion that arose from the expert testament, where you were blindsided and not given a basis to challenge the segment's testimony that these are suited to a postal lock, and you were given no explanation about how to come to that conclusion, that hurt the confusion to the jury, that essentially enabled the jury to convict on the basis of the argument. Was it a counterfeit postal key, even though there's sufficient evidence he could open a postal lock? Exactly. That's exactly our argument, Your Honor. Thank you very much. Well-reserved decision. Very helpful argument.